**Charles E. DONAHUE, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

No. Civ.A. 98–5874.

United States District Court, E.D. Pennsylvania.

June 10, 1999.

Joseph M. Sellers, Jennifer A. Gundlach, Cohen, Milstein, Hausfeld and Toll, Washington, DC, Mark T. Wade, Robert Peirce and Associates, Pittsburgh, PA, for Charles E. Donahue, plaintiff.

Alan D. Berkowitz, M. Frances Ryan, Heather A. Hoyt, Dechert, Price & Rhoads, Phila, PA, Thomas H. May, Dickie, Mc Camey & Chilcote, P.C., Pittsburgh, PA, for Consolidated Rail Corporation, defendant.

**MEMORANDUM and ORDER**

KATZ, Senior District Judge.

In this claim of employment discrimination under the Rehabilitation Act,[1] plaintiff Charles Donahue alleges that defendant Conrail discriminated against him based on his disability by failing to transfer him to a new job when a heart condition made him unable to perform his job as a conductor. Presently before the court is defendant's motion for summary judgment, plaintiff's response, and defendant's reply. Based on the following analysis, the motion will be granted.[2]

*Facts*

Plaintiff Donahue worked for Conrail from June 1977 to March 1994. From 1987 until 1994, he worked variously as an engineer and a conductor. According to Donahue's deposition testimony, an engineer's job is to "[o]perate trains," and a conductor's job is to "[t]ake care of the trains, fix them when they break down and ship out cars and deliver cars to different places." Def.Ex. 2 at 8; *see also* Exs. 19, 20 (Conrail's job descriptions, which essentially match plaintiff's statements).

In February 1993, Donahue had a heart attack, and he went on disability leave. In May, he received clearance from his treating physician and the Conrail Medical Department, he returned to work as a conductor. At the beginning of September 1993, plaintiff passed out while working in the train yard and fell off a train, falling

---

1. The suit originally contained a claim under the Americans with Disabilities Act as well, which the court previously dismissed for failure to exhaust administrative remedies. Substantively, the two claims are identical. The Rehabilitation Act provides, "The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act...." 29 U.S.C. § 794(d). The ADA case law relating to the definition of a qualified individual and what is a reasonable accommodation is equal-ly applicable to Rehabilitation cases, and vice versa. *See, e.g., Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997).

2. "[S]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997); *see also* Fed.R.Civ.P. 56(c).

eight feet to the ground. *See* Def.Ex. 2 at 30.

His cardiologist, Dr. Elson, diagnosed that the blackout had been caused by ventricular tachycardia, which is "a fast heartbeat from the bottom part of the heart where the heart rate goes at an extremely fast rate, and the heart can't pump blood, and the result is loss of consciousness." Def.Ex. 3 at 33 (Elson dep.). A few weeks later, the doctor performed surgery to implant a cardiac defibrillator, which shocks the heart to stop the ventricular tachycardia when the patient's pulse exceeds a certain speed. *See id.* at 16, 33. The defibrillator does not prevent a tachicardic episode or the attendant loss of consciousness, and plaintiff could experience an episode at any time. As plaintiff testified at his deposition, he should expect to have blackouts in the future. *See* Def.Ex. 2 at 42; *see also* Def.Ex. 3 at 18 (Dr. Elson's statement that plaintiff is "absolutely" still prone to pass out at any time).

Plaintiff was out from work for several months. On March 1, Dr. Elson provided a letter that said, "we feel that he should be able to return to work at this time. However, he obviously should not be working as an engineer." Def.Ex. 5. Based on that letter and on a physical examination by Conrail medical personnel, Conrail cleared Donahue to return to work as a conductor. In his desire to return to work, plaintiff apparently was not completely forthright. He did not disclose the fact that Dr. Elson had warned him, more

broadly than indicated in Elson's letter, not to work around trains because it would be dangerous.[3] Plaintiff signed a statement on the medical questionnaire that said he did not have "[a]ny health problem which might keep you from doing your job safely." Def.Ex. 6. When the examining nurse expressed her reservations about his returning to work either as an engineer or a conductor, "I told her she doesn't know what I do for a living," and that he was able to return to work as a conductor. Def.Ex. 2 at 38–39.

Donahue returned to work as a conductor on March 14.[4] On March 16, his third day back, he passed out while walking down a track and was taken to the hospital. When he met with Dr. Elson shortly after that incident, the doctor told him that "he shouldn't be doing that kind of work.... he shouldn't be riding on trains, working on trains and moving locomotives, as I recall." Def.Ex. 3 at 14. "Anything that was a moving train, I thought, was dangerous for him and for others." *Id.* at 17.

A few days after the incident, before he saw his doctor, Donahue asked the crew dispatcher to put him back on the board for his regular conductor job but was told he could not return without a physical. Def.Ex. 2 at 47. He then spoke to District Supervisor Max Solomon, whom plaintiff testified told him he was "done." *Id.* The superintendent was also present, and he told plaintiff that "for safety reasons I

---

**3.** At his deposition, Elson testified that he told plaintiff that he should not work in "any type of job that might pose a threat to his welfare if he passed out." Def.Ex. 3 at 11–12. The discrepancy between this and his statement in the letter only prohibiting plaintiff from working as an engineer is explained by the fact that Donahue did not talk with his doctor about what a conductor does. *See id.* at 12.

**4.** On March 7, after Donahue had been cleared but before he returned, Road Foreman Wayne Beemler telephoned the Medical Department. He pointed out that a conductor is required to work on and around trains, and said that because plaintiff had passed out at work six months ago, it was too dangerous

for him to come back to be a conductor. *See* Def.Ex. 7. The doctor in charge then spoke to Donahue and said he did not see any reason Donahue could not return to work. *See* Def. Ex. 2 at 39. Plaintiff relies on Beemler's phone call to show Conrail's discriminatory intent. That is unpersuasive given that Beemler was actually agreeing with plaintiff's own doctor that plaintiff's working on and around trains was dangerous and given that the concern so soon proved to be warranted. It is also unpersuasive because the doctor's decision overriding Beemler's concern shows that it was the doctor who was the relevant decision maker in Donahue's case.

shouldn't go back to work as a trainman or a conductor or an engineer." *Id.* Plaintiff asked what he could do to keep his job at Conrail, and Solomon suggested he apply for road foreman or train dispatcher. At that suggestion, Donahue submitted his resume to the lead road foreman, who told him there were no vacancies. *See id.* at 54. Plaintiff also sent his resume to a person named David Young to apply for a dispatcher job. *See id.* at 57. Young is an engineer who has nothing to do with hiring, and who in any case did not receive an application from Donahue. *See* Def.Ex. 15. At some later time Donahue had a second conversation with Solomon, in which Solomon said he did not think there were road foreman jobs available, and that plaintiff perhaps should apply to locomotive engine school. *See id.* at 51–52. Solomon also told Donahue that if there were any possible jobs at Conrail for him, a prerequisite to any of them was being given a return to work notice from his doctor. *See* Def.Ex. 14 at 21–23.

The following month, Donahue applied for Railroad Retirement Board disability benefits. *See* Def.Ex. 8. Eligibility for that benefits program depends on the railroad employee's having a disability that makes him "unable to do any substantial gainful activity." 20 C.F.R. § 220.261. Plaintiff was approved. *See* Def.Ex. 17. Some time later, Donahue was required to submit documentation to Conrail's disability insurer in connection with the short-term benefits he had received before qualifying for his RRB benefits. In that form, which was received by the Director of Labor Relations and Personnel on May 25, 1994, Dr. Elson stated that Donahue would "never" be able to resume his regular job, but he could resume work at another job for which he is qualified "now." There is

no evidence as to what further use this document was put.[5]

Mr. Donahue did not ever ask his doctor to certify him as able to return to work. *See* Def.Ex. 3 at 14. He has not returned to work and has continued to receive disability benefits.

*Discussion*

To make out a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show the following: (1) that he has a disability; (2) that he is a qualified individual, i.e., he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he was nonetheless terminated or otherwise prevented from performing the job. *See Mengine v. Runyon,* 114 F.3d 415, 418 (3d Cir.1997). Conrail argues that plaintiff fails to prove these required elements in a number of ways.

*Estoppel*

■ Conrail first argues that all of plaintiff's claims should be dismissed because he is judicially estopped from asserting he is a qualified individual because he certified himself as totally disabled in his application for Railroad Retirement Board disability benefits. *See* Def.Ex. 8. Since the motion was filed, the Supreme Court ruled in *Cleveland v. Policy Management Systems Corp.,* —— U.S. ——, 119 S.Ct. 1597, —— L.Ed.2d —— (1999), that application for and receipt of disability benefits does not estop a recipient from pursuing an ADA claim, nor does it erect a strong presumption against the recipient's ADA success.[6] The Court ruled that to survive a summary judgment motion, the plaintiff must explain why the contention that he was too disabled to work is consistent with

---

**5.** Plaintiff's memorandum states that the Director "directed that further information on Mr. Donahue's disability be sent to Conrail's Personnel Department." Pl.Memo. at 11. There is no evidence of this fact, nor is there any evidence as to what use is normally made of this document.

**6.** *Cleveland* involved the plaintiff's receipt of Social Security Disability Insurance benefits and an ADA claim, but the same reasoning applies to Donahue's receipt of Railroad Retirement Benefits and a Rehabilitation Act claim.

his ADA claim that he can perform the essential functions of his job, at least with reasonable accommodations. *See id.* at 1599. Simply put, plaintiff must "proffer a sufficient explanation" reconciling the two assertions. *Id.* at 1603.

Conrail continues to argue that plaintiff has not met the standard required by *Cleveland,* but the court is satisfied that plaintiff has done so. His statements must be read in light of the differing purposes of the two programs and in light of the fact that the Railroad program does not consider the potential for accommodation. On his disability application, Donahue stated that he could not work "as an engineer." Def.Ex. 8 at box 26. In describing his actual physical abilities, he said he could do almost every listed activity easily.[7] *See id.* at box 39. He made no attempt to hide the fact that he considered himself physically able to work, except at the job he had been doing. Both of the doctors' letters submitted in support of his application stated only that they considered him unable to perform his former job. *See* Pl.Ex. 11 (Elson's letter stating, "he should not work at his present occupation of engineer or conductor"); Pl.Ex. 12 (Austin's letter stating, "Mr. Donahue is totally medically disabled from his regular occupation"). All of these statements are entirely consistent with plaintiff's position in this case that he could have done some job at Conrail other than conductor.

### Disability

Defendant next argues that plaintiff is not disabled within the meaning of the ADA and the Rehabilitation Act, because "plaintiff's heart condition does not substantially limit any major life activities—he simply cannot do things which would present a danger to himself or others if he were to pass out, or perform unusually strenuous tasks." Def.Memo. at 15. An individual is disabled if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (ADA definition, equally applicable to the Rehabilitation Act). Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

■ Plaintiff asserts that he is substantially limited in the major life activity of working.[8] He argues that because he is unable to work in any job that might cause a danger to himself or others if he were to pass out suddenly, he is unable to perform a broad range of jobs. *See* 29 C.F.R. § 1630(j)(3)(i). Defendant simply argues conclusorily that despite that restriction, plaintiff is not unable to perform a broad range of jobs. Plaintiff's vocational expert, Joseph Spoonster, says this:

> In terms of labor market access, Mr. Donahue is significantly limited across a broad spectrum of jobs.... In my opinion, he is restricted to work which falls in the Sedentary exertional classification of job titles. Based on a factor analysis of worker strength requirements, Mr. Donahue has lost access to 89.04% of the occupational titles described in the Dictionary of Occupational Titles as a consequence of his health condition.

Pl.Ex. 30. Based on this report, plaintiff has enough evidence to survive summary judgment on this point.

---

**7.** The one exception was "Conducting Personal Business (Talking To and Dealing With Other People)," which he said was hard because "don't care to." Def.Ex. 8 at box 39. This does not undercut the point that he was able to work.

**8.** It is true that if any other activity is claimed to be affected the court should consider them and not address working unless the others

fail. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working."). Where working is the only major life activity plaintiff claims is affected, however, of course a determination must be made.

*Accommodation*

With respect to his former job of conductor (or engineer), Donahue admits that he is not qualified to perform its essential functions, because it is dangerous for him to operate trains or work on and around trains in the yard. *See* Def.Ex. 2 at 54. He does not claim that Conrail should have made some accommodation for him within the job of engineer or conductor; instead, he argues that Conrail should have transferred him to another job. The gravamen of plaintiff's claim is that Conrail failed to engage in the required interactive process with him to help him locate a vacant job elsewhere in the company for which he was qualified.

The ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9. Based on these provisions, the Third Circuit has held that when notified of an employee's disability and desire for accommodation, the employer has "the duty to make reasonable efforts to assist [him], to communicate with him in good faith, and to not impede his investigation." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir.1997), *citing Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996).

In *Taylor v. Phoenixville School District*, 174 F.3d 142 (3d Cir.1999), the Third Circuit recently laid out in great detail what is required of the employee and the employer in the contemplated interactive process. At the end of a long and careful explanation, the court summed it up:

> To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* at 165, *citing Mengine*, 114 F.3d at 421, and *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir.1996). In analyzing these factors on the facts of this case and the above discussion, the court concludes as follows:

(1) Conrail certainly knew about Donahue's disability, given that he had lost consciousness twice at work.

■ (2) Plaintiff requested accommodation of his disability. Conrail depends on the fact that Donahue did not go to either the Medical Department or the Personnel Department to argue that he did not properly initiate an interactive process. Yet Conrail's own doctor testified that the Operating Departments were in charge of providing accommodations to their employees. *See* Pl.Ex. 6 at 37, 41. Donahue notified the supervisor of his Operating Department, the same person he says he had notified the previous times that he desired to return to work. The court cannot say that Donahue failed to notify Conrail that he desired to be accommodated when he went to the person who the company's own personnel say had the responsibility to work with an employee to accommodate him and asked, "[W]hat can I do to keep the job? What can I do?" Def.Ex. 2 at 49.

(3) Donahue has at least created a jury question as to whether Conrail made a good faith effort to help him. Based on the facts described above, the court cannot say conclusively that Conrail satisfied its duty to participate in an interactive process, because it is not clear that the company made reasonable efforts to assist Donahue. After Donahue plainly asked for help, it does not appear that Solomon made any effort at all to help him find another job or directed him to someone who could help.

■ (4) Donahue has not shown that he could have been accommodated but for Conrail's lack of good faith assistance, because, as discussed in detail above, he has not shown that there was any vacant job available for him. The court is persuaded that no reasonable jury could find that reassignment to any of the jobs suggested by plaintiff would have been a reasonable accommodation for plaintiff. Plaintiff points to the following jobs as possible transfer accommodations: train dispatcher, block operator, yardmaster, hump conductor, car retarder operator, switch tender, and clerical positions.[9]

A train dispatcher directs the movements of trains in a given territory, much like an air traffic controller does for planes. The dispatcher sets the signals and controls the switches, and responds to emergency calls from disabled trains and alerts other trains to any situation that could cause them delay or danger. See Def.Ex. 22 at 24–25, 36. Although the dispatcher himself is not on and around trains, it nonetheless could obviously cause great danger to others should a dispatcher pass out in the middle of doing the job.

Thus, it is exactly the kind of job that Dr. Elson said Donahue should not perform. The position of block operator is similar to a train dispatcher position, only on a smaller scale. See Pl.Ex. 25 at 18. Plaintiff therefore was also not qualified to perform that job for the same reason.

■ The position of yardmaster is a promotion from plaintiff's position of conductor, see Def.Ex. 23, and an employer is not required to promote an employee as an accommodation for a disability. See Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir. 1996).

There is no evidence in the record that indicates the job requirements of hump conductor, car retarder operator, or switch tender. Plaintiff submits Dr. Nowsiwsky's deposition testimony saying, based on documents he was shown during his deposition, that Donahue would not be unable to perform those jobs. However, that same testimony indicates that he does not know what those jobs do, and in fact the written descriptions do not match up with his understanding of the jobs' actual responsibilities. See Pl.Ex. 6 at 100–01. The doctor indicated that at least one of those jobs (what he thought was hump conductor or car retarder) involves standing between moving trains coupling and uncoupling them. See id. at 98–99. His testimony as a whole could not be grounds for a reasonable jury to find that plaintiff could perform any of those jobs. Moreover, plaintiff has not presented any evidence that there were any vacancies in these jobs.[10]

Last, with the full benefit of discovery, plaintiff has produced no evidence that

---

9. Previously, Donahue also suggested the possibility of police officer, trainmaster, and road foreman. None of these would have been a suitable accommodation. Road foreman and trainmaster both would have been promotions, and police officer had physical fitness requirements that plaintiff could not have satisfied.

10. Plaintiff contends that he is not required to identify vacant jobs to survive summary judg-

ment. See Pl.Memo. at 38. It is true that an employee need not identify a particular vacancy at the time he requests accommodation to trigger the employer's duty to participate in the interactive process. To succeed in proving a discrimination claim, however, "the employee has the duty to identify a vacant, funded position whose essential functions he is capable of performing." Mengine, 114 F.3d at 420, citing Shiring, 90 F.3d at 832.

there was any available clerical job in which he could have been accommodated.

*The Result*

What should follow from these conclusions is somewhat unclear, because *Taylor*'s dictates appear to be inconsistent in a critical respect. The court certainly made it clear that the employer has a substantial duty to engage in an interactive process with an employee who properly initiates it, and the court made it equally clear that "where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." 174 F.3d 142, 164. This court certainly does not wish to give short shrift to either the letter or spirit of those clear instructions. Yet the *Taylor* court also reaffirmed what it had stated in *Mengine:* "On the other hand, ... 'the ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made.'" *Taylor,* 174 F.3d 142, 162, *quoting Mengine,* 114 F.3d at 420 (*quoting Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997)). The full statement in *Mengine* was even stronger, adding, "Where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." 114 F.3d at 420, *quoting Willis,* 108 F.3d at 285.

In *Mengine,* the court acknowledged a possible "tension," and by way of resolution said only that "it may be more a matter of timing." *Id.* This tension became even more explicit when the *Taylor* court listed as one of the elements that a plaintiff must demonstrate to show that an employer failed to participate that "the employer could have been reasonable accommodated but for the employer's lack of good faith." 174 F.3d 142, 165.[11]

This apparent contradiction was not put to the test in *Taylor,* because the court concluded that a reasonable jury could find that "there were accommodations that the [employer] could have provided." *Id.* at 165. Nor was it put to the test in *Mengine,* because the court ruled that the employer had in fact satisfied its duty to participate. *See* 114 F.3d at 421. Here, though, I am squarely confronted with the problem: Donahue has demonstrated that Conrail was aware of his disability and his desire for accommodation by transfer, and it is at least arguable that Conrail did not make a good faith effort to assist him. However, Donahue has not put forth any evidence from which a reasonable jury could find that he could have been reasonably accommodated but for Conrail's bad faith, because Conrail has successfully refuted each proposed transfer position he proposed then or proposes now.

The court is mindful of the existence and wisdom of the rule that an employer should not be allowed "simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." *Taylor,* 174 F.3d 142, 160. The court is equally mindful of *Taylor*'s instruction that "the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *Id.* at 162. In this case, however, construing those rules to mean that the case must proceed to trial is at odds with the court's fundamental job on a summary judgment motion, which is to grant it if no reasonable jury could find for plaintiff.

■ Ultimately, "the employee has the duty to identify a vacant, funded position whose essential functions he is capable of performing." *Mengine,* 114 F.3d at 420,

---

**11.** The court also stated that the employer was, "of course, free to argue on remand that no accommodation would have allowed [plaintiff] to perform the essential functions of her job." 174 F.3d 142, 165. The court did not specify whether this was an argument to be made to win summary judgment or to be made to the jury at trial.

*citing Shiring,* 90 F.3d at 832. "If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA or Rehabilitation Act violation." *Mengine,* 114 F.3d at 420. Donahue has not presented any evidence that he can meet that ultimate burden. Were a jury to find in Donahue's favor, it would be exactly the case that *Mengine* and *Taylor* correctly declared that the ADA is not intended to redress—where the employer behaved callously but in fact no accommodation could reasonably have been made. *See Taylor,* 174 F.3d 142, 162; *Mengine,* 114 F.3d at 420.

*Conclusion*

Because Donahue has not presented evidence from which a reasonable jury could find that a job was available to accommodate him, summary judgment must be entered for Conrail. An appropriate Order follows.

### ORDER

**AND NOW,** this 10th day of June, 1999, upon consideration of the defendant's Motion for Summary Judgment, and the plaintiff's response thereto, it is hereby ORDERED that the said motion is **GRANTED.**